UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TRILL ENTERTAINMENT, LLC

VERSUS

B C D MUSIC GROUP, INC.

CIVIL ACTION

NO. 07-559-JJB-SCR

**RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO COMPEL**

This matter is before the court on a Motion for Partial Summary Judgment (doc. 27) and a Motion to Compel (doc. 22) by B C D Music Group, Inc. The Plaintiff opposes these motions (docs. 26, 35). Oral argument is not necessary. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

**Motion for Partial Summary Judgment**

**I.    Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. Rule Civ. P. 56(c).  The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, as it does

1

here, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id*. The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id*.

Although this Court considers the evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the non-moving party. *Celotex*, 477 U.S. at 322; *see also*, Fed. Rule Civ. P. 56(c).

## II.    Analysis

B C D Music Group has filed for partial summary judgment on the ground that registering one's copyright is a precondition to filing an infringement action. The Defendant contends that because Trill has failed to produce documents indicating copyright ownership during the discovery period, summary judgment should be granted in favor of B C D Music Group. Trill's response is that "[r]egistration has

2

been made or is being made for all of the recordings at issue."[1]  Registration of the recordings at issue took place on the following dates: (1) "Bad Azz Mixtape, Vol. 2" was registered in June 2007; (2) "Streetz is Mine" and accompanying registration was sent to the US Copyright Office on June 3, 2008; (3) "Gangsta Grillz 14" was registered in June 2005 as part of the "Savage Life" album; and (4) "Bad Ass Mixtape" and accompanying registration was sent to the US Copyright Office on June 3, 2008.  The instant action was filed on August 6, 2007.

Copyright law dictates that "no action for infringement of the copyright of any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).  The Fifth Circuit has consistently held that registration is a "jurisdictional prerequisite to an infringement claim."  *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997).  Although receipt of the registration certificate is not required, the Fifth Circuit has interpreted § 411 to require that the plaintiff file a copyright application, deposit, and fee *before* a plaintiff commences an infringement action.  *Starr v. DaimlerChrysler Corp.*, 2007 U.S. App. LEXIS 24978, *1 (5th Cir. 2007).

In limited circumstances, the Fifth Circuit has allowed a plaintiff to cure the jurisdictional defect of failing to register a copyright before commencing an action by subsequently amending or supplementing its complaint after registration is completed.  *Positive Black Talk, Inc. v. Cash Money Recordings, Inc.*, 394 F.3d 357,

---

[1] Trill's Pre-Trial Memorandum (doc. 32) at 3.

365 (5th Cir. 2004) (allowing a plaintiff who filed a copyright action four days before registering with the US Copyright Office to cure the defect).  Although the Fifth Circuit made an exception to the statutory filing requirements in *Positive Black Talk*, this case "is not a blank permission slip for district courts to disregard pleading failures in copyright claims." *The Levingston Corp. v. DeWalyes Ltd. Int.*, 2008 U.S. Dist. LEXIS 12327, *5 (E.D. La. 2008).  This jurisdictional defect can only be cured by registering the copyright and amending the complaint.  *Id.*  In other words, "Evidence that the Copyright Office has received the application–no matter how reliable–does not substitute or obviate the plaintiff's obligation to amend the pleadings."  *Id.*  Therefore, contrary to the plaintiff's assertion that all that is necessary for the suit to proceed is evidence that the "application, deposit and fee payment have been received by the Copyright Office," courts in the Fifth Circuit have required the plaintiff to cure this jurisdictional defect by subsequently amending the complaint to reflect registration with the US Copyright Office.[2]

--------

[2] Trill's Opposition to Partial Summary Judgment (doc. 35) at 3-4.  Trill relies on an unpublished opinion from the Northern District of Illinois for the proposition that merely sending off the registration paperwork and filing fee are sufficient to establish copyright ownership.  *See Lofton v. Lofton*, 2000 WL 1508236 (N.D. Ill. 2000).  This case ignores jurisprudence in the Fifth Circuit that requires registration as a prerequisite to commencement of an infringement action, or at the very least, amendment of the complaint following registration.  *Positive Black Talk Inc. v. Cash Money Recordings Inc.*, 394 F.3d 357 (5th Cir. 2004); *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814 (5th Cir. 1997); *Starr v. Daimler Chrystler Corp.*, 252 Fed. Appx. 590 (5th Cir. 2007); *The Levingston Corp. v. DeWaytes Ltd. Int.*, 2008 U.S. Dist. LEXIS 12327 (E.D. La. 2008); *Source Data Acquisition, LP v. The Talbot Group, Inc.*, 2008 U.S. Dist. LEXIS 11009 (E.D. Tex. 2008); *Messina v. Hailey*, 2008 U.S. Dist. LEXIS 18974 (W.D. Tex. 2008).

In addition, the Plaintiff's reliance on *Lakedreams* is distinguishable.  The parties in *Lakedreams* filed their paperwork with the US Copyright Office well before the suit

As such, Trill's recent registration of "Streetz is Mine" and "Bad Ass Mixtape" on June 3, 2008, is clearly at odds with the jurisdictional requirements of § 411 and Fifth Circuit jurisprudence on this issue.  These recordings should have been registered with the US Copyright Office prior to commencing the instant action, or in the alternative, these jurisdictional defects should have been cured by registration and subsequently amending the complaint.  *Starr v. Daimler Chrystler Corp.*, 252 Fed Appx. 590 (5th Cir. 2007).  Trill has not amended its complaint to indicate the date of registration, and it has only sent off its registration one week before the scheduled bench trial on June 11, 2008.  With respect to recordings "Bad Ass Mixtape" and "Streetz is Mine," Trill has failed to demonstrate that it has satisfied the jurisdictional requirements necessary to bring an infringement action, and summary judgment in favor of B C D Music Group will be granted for these recordings.

Trill has demonstrated that proper copyright registration was secured well before the commencement of this action for "Bad Azz Mixtape, Vol. 2" and for songs by Webbie featured on "Gangsta Grillz 14."  Therefore, trial on the merits will continue as scheduled for these recordings only.

---

commenced, and the issue was whether obtaining a physical copy of the registration was a jurisdictional prerequisite. *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991).  This issue is distinct from the instant action where the timing of the registration application is at issue.  Unlike *Lakedreams*, Trill has waited until the eve of trial to register its copyright, and this eleventh hour filing does not satisfy the filing requirements in the Fifth Circuit.

**Motion to Compel**

The Defendant, B C D Music Group, is seeking an Order compelling Trill to provide complete answers to a request for production of documents.  By written request, B C D asked Trill to produce any and all documents "reflecting that Plaintiff owns the exclusive rights to market the name, likeness and musical recordings of Lil Boosie."  In response to this request, Trill provided a copy of the "Exclusive Recording Agreement with Artist" with most of the paragraphs blacked out.  Although Trill has allowed counsel for the Defendant to examine a clean copy of this document, Trill objects to the production of the agreement in its entirety because it contains "highly confidential and proprietary information not relevant to this litigation."

Pursuant to Rule 26, a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Fed. R. Civ. P. 26.  A party who opposes the discovery of non-privileged information bears the burden of establishing the need for a protective order.  Fed. R. Civ. P. 26(c).  A court can issue a protective order in order to protect a party from annoyance, embarrassment, oppression, undue burden or expense.  *Id.*

In this case, Trill has not applied for a protective order, and instead, has unilaterally decided to redact portions of the agreement.  Following the June 3, 2008, status conference, the court directed Trill to submit a clean copy of the agreement for the court to review in camera.  The court has taken this submission under advisement, and a newly redacted copy is attached to this ruling as Exhibits A and

B.  The parties are instructed to use this copy during the June 11, 2008 trial.

Accordingly, the Motion for Partial Summary Judgment (doc. 27) is **GRANTED IN PART AND DENIED IN PART**.  It is granted with respect to "Bad Ass Mixtape" and "Streetz is Mine", and it is denied with respect to "Bad Azz Mixtape, Vol.2" and "Gangsta Grillz 14."  The Motion to Compel (doc. 22) is **GRANTED** to the extent indicated in the attachment.

Baton Rouge, Louisiana, June 9th 2008.

JAMES J. BRADY, JUDGE
MIDDLE DISTRICT OF LOUISIANA

7



# TRILL ENTERTAINMENT, L.L.C.

# EXCLUSIVE RECORDING AGREEMENT WITH ARTIST

AN AGREEMENT made this **27th** day of **January, 2005,** between *TRILL ENTERTAINMENT, L.L.C.* (hereinafter referred to as ``**Company")** and **TORENCE HATCH P/K/A LIL BOOSIE** (hereinafter referred to as ``**you"** or **"Artist").**

## 1. REPRESENTATIONS, WARRANTIES AND COVENANTS:

**1.01.** During the term of this agreement, you will furnish to Company your exclusive recording services in the Territory.

**1.02.** You are authorized, empowered and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment hereof by any party infringes upon the rights of any Person. You have no knowledge of any claim or purported claim which would interfere with Company's rights hereunder or create any liability on the part of Company.

**1.03** Omitted.

**1.04.** There now exist no prior unreleased recorded performances.

**1.05.** Omitted.

**1.06.** You will not perform for (and neither you license or consent to or permit the use by any Person other than Company your name or likeness for) or in connection with the recording or exploitation of any Phonograph Record embodying any Composition recorded by you under this agreement prior to the later of the date five (5) years subsequent to the date of delivery to Company hereunder of the last Master.

**1.07.** None of the Masters hereunder, nor the performances embodied thereon, nor any other Materials, as hereinafter defined, nor any authorized use thereof by Company or its grantees, licensees or assigns, will violate or infringe upon the rights of any third party. ``Materials" as used herein means: all Controlled Compositions; each name or sobriquet used by you or Artist, individually or as a group; and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by you or any individual producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

**1.08.** You shall not authorize or knowingly permit your performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Phonograph Records in violation of the restrictions herein, and you shall take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than Company of such Phonograph Records. You, nor any Person deriving any rights from you, shall use or authorize or permit any Person other than Company to use your name (including any professional name or sobriquet), likeness (including picture, portrait or caricature) or biography in connection with the manufacture and/or exploitation of Masters or Phonograph Records.

**EXHIBIT**

**A**

tabbies®

Page 1 of 13



1.09.  You will perform under a professional name, to be chosen by you and agreed to by Company. You will be the sole owner of such professional name and no other Person has or will have the right to use such name in connection with Phonograph Records during the term. You shall not use a different name in connection with Phonograph Records unless Company agrees in writing.

## 2. TERM:

2.01.  The term of this agreement will commence on the date hereof and continue, unless extended as provided herein, for a first Contract Period (sometimes referred to as the ``initial Contract Period'') ending *seven (7)* months after the date of the delivery to Company of all Masters required in fulfillment of your Recording Commitment for such Period but in no event earlier than *twelve (12)* months after the date of the commencement of such period.

2.02.  Additionally, you hereby grant Company ten (10)  separate options to extend the term of this agreement for additional Contract Periods (``Option Periods'') on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein. Company may exercise each of  those options by sending you a notice at any time before the expiration of the Contract Period which is then in effect. If Company exercises such an option, the Option Period concerned will begin immediately after  the end of the current Contract  Period. The term of each option period will end *seven (7)* months after the date of delivery to Company of all Masters required in fulfillment of your Recording Commitment for such Period but not earlier than *eighteen (18)* months after the date of commencement of the first and second Option Periods and *twelve (12)* months after the date of commencement of the third Option Period.







Page 3 of 13



Page 4 of 13

7. <u>ROYALTIES:</u>

7.01. In consideration of (i) the copyright ownership provided below; (ii) Company's rights to use Artist's name and likeness as provided herein; and (iii) the other agreements, representations and warranties contained herein, Company agrees to pay you in connection with the Net Sale of Phonograph Records consisting entirely of Masters hereunder and sold by Company or its licensees, a royalty computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such royalties will be computed and paid in accordance with clause 8 below and the other provisions set forth herein:

(A) On Records sold for distribution through normal retail channels in the United States (``USNRC Net Sales''):

    (i) On LPs:

        (a) On Masters made during the initial Contract Period ████████

        (b) The royalty rate pursuant to clause 7.01(A)(i)(a) shall apply to the first ████████ of USNRC Net Sales of LPs comprised of such Masters. The royalty rate will be:

            (1) ████ rather than ████ on the next ████████ of any such LP (*i.e.*, USNRC Net Sales between ████████ and ████████ and

            (2) ████ on USNRC Net Sales of any such LP in excess of ████████

        (c) On Masters made during any Option Period ████████

        (d) The royalty rate pursuant to clause 7.01(A)(i)(c) shall apply to the first ████████ of USNRC Net Sales of LPs comprised of such Masters. The royalty rate will be:

            (1) ████ rather than ████ on the next ████████ of any such LP (*i.e.*, USNRC Net Sales between ████████ and ████████

            (2 ████ on USNRC Net Sales of any such LP in excess of ████████

    (ii) On Singles: ████

(B) On Records sold for distribution through normal retail channels outside the United States, the royalty rate shall be ████████ of the applicable royalty rate provided in clauses 7.01(A)(i)(a), 7.01(A)(i)(c), 7.01(A)(i)(e), or 7.01(A)(ii), as the case may be.





**7.05.** As to Records not consisting entirely of Masters, the royalty rates otherwise payable to you hereunder shall be prorated on the basis of the number of Masters which are embodied on such records compared to the total number of masters (including the Masters) contained on each such Record. As to Joint Recordings, the royalty rate due shall be the royalty rate provided for herein divided by the number of artists with respect to whom Company is obligated to pay a royalty (including Artist).

**7.06.** No royalties shall be due or payable in respect of (i) Records furnished on a no-charge basis or sold for less than ███████ of Company's or the *Company Distributor's* (or their respective licensees') posted wholesale list price to disc jockeys, publishers, employees of Company or the *Company Distributor* (or their respective licensees'), motion picture companies, radio and television stations and other customary recipients of free, discounted or promotional Records; (ii) Records sold by Company or the *Company Distributor* at close-out prices or for scrap, or at less than Company's or its Distributor's (or their respective licensees') inventory cost; (iii) Records (or fractions thereof) given away or shipped on a so-called ``no charge'' or ``freebie'' basis or sold for ███████ or less of Company's or *Company Distributor's* (or their respective licensees') posted wholesale list price, to distributors, sub-distributors, dealers and others.

**7.07.** The royalty payable to you hereunder includes all royalties due Artist, the individual producers and any other Persons on account of the sale of Records hereunder (other than AF of M or other similar per-record royalties and mechanical royalties).

8. <u>ROYALTY ACCOUNTINGS:</u>





## 9. COMPANY'S ADDITIONAL RIGHTS:

**9.01.** You warrant, represent and agree that throughout the Territory, Company is the sole, exclusive and perpetual owner of all Masters delivered hereunder or recorded by Artist during the term of this agreement, which ownership entitles Company, among other things, to all right, title and interest in the copyright in and to the Masters (but excluding the copyrights of the musical compositions contained therein). Each Master made under this agreement or during its term, from the inception of its recording, will be considered a ``work made for hire'' for Company; if any such Master is determined not to be such a ``work,'' it will be deemed transferred to Company by this agreement, together with all rights and title in and to it. All Masters made under this agreement or during its term (including duplicates, work tapes, etc.), the performances contained thereon and the Recordings derived therefrom shall, from the inception of their creation, be the sole property of Company, in perpetuity, free from any claims by you, Artist or any other Person and Company shall have the right to use and control same subject to the terms herein. Company (or Company's designees) shall have the exclusive right to copyright all such Masters in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the Territory. You will execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company or its designees in the Masters subject to this agreement as Company may reasonably request to carry out the purposes of this agreement, and Company may sign such documents in your name or the name of Artist (and you hereby appoint Company your agent and attorney-in-fact for such purposes) and make appropriate disposition of them consistent with this agreement.

**9.02.** Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited and exclusive rights to manufacture Records by any method(s) now or hereafter known embodying any portion(s) or all of the performances embodied on Masters hereunder; to publicly perform such Records and to permit the public performance thereof in any medium; to import, export, sell, transfer, lease, rent, deal in or otherwise dispose of such Masters and Records derived therefrom throughout the Territory under any trademarks, trade names or labels designated by Company; to edit or adapt the Masters to conform to technological or commercial requirements in various formats now or hereafter known or developed, or to eliminate material which might subject Company to any legal action; to use the Masters for background music, synchronization in motion pictures and television soundtracks and other similar purposes, including, without limitation, use on transportation facilities, without any payment other than as provided herein; or Company and its subsidiaries, affiliates and licensees may, at their election, delay or refrain from doing any one or more of the foregoing.

**9.03.** Company and any licensee of Company each shall have the perpetual right, without liability to any Person, and may grant to others the right, to reproduce, print, publish or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and individual producer and all other persons performing services in connection with Masters made under this agreement (including, without limitation, all professional, group and other assumed or fictitious names used by them), and biographical material concerning them for purposes of advertising, promotion and trade in connection with you or Artist, the making and exploitation of Records hereunder and general goodwill advertising. During the term hereof, Company or its licensees may, in the Territory, bill, advertise and describe Artist as an Exclusive Company Artist or by a similar designation. Company's rights as described in this clause shall be exclusive during the term of this agreement and non-exclusive thereafter. Artist shall be available from time to time to appear for photography, poster and cover art and the like, under the reasonable direction of Company or its nominees, and to appear for interviews with representatives of the communications media and Company's publicity personnel. You shall not be entitled to any compensation for such services, except as may be required by applicable union agreements; provided, however, that if you are required to travel outside of a fifty mile radius of your then place of residence, Company shall reimburse you for the reasonable travel and living expenses incurred by you or Artist in connection with the rendition of services rendered at Company's direction as provided herein pursuant to a budget approved in advance by Company in writing.

## 10. LICENSES FOR MUSICAL COMPOSITIONS:

**10.01.** (a) (1) You hereby grant to Company an irrevocable license under copyright to reproduce each Controlled Composition on Phonograph Records and distribute them in the United States and Canada.

(2) For that license, Company will pay Mechanical Royalties, on the basis of Net Sales, at the following rates:

(i) *On Records manufactured for distribution in the United States:* The rate equal to ███████████████████████ of the minimum compulsory license rate applicable to the use of musical compositions on Phonograph Records under the United States copyright law at the time of the commencement of the recording of the Master concerned but in no event later than the last date for timely delivery of such Master. (That minimum statutory rate is currently 7.1 cents per Composition, effective January 1, 1998.)

(b) The total Mechanical Royalty for all Compositions (including Controlled Compositions) with respect to (i) each single disc LP (or the equivalent thereof) shall be ████████████████████ the minimum statutory rate referred to in subclause 10.01(a)(2)(i);

(c) Company will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On the next May 15th, August 15th, November 15th, or February 15th, Company will send a statement covering those royalties and will pay any net royalties which are due. Mechanical Royalty reserves maintained by Company against anticipated returns and credits will not be held for an unreasonable period of time.

(d) Any assignment made of the ownership of copyright in, or the rights to license or administer the use of, any Controlled Composition shall be made subject to the provisions of this Clause 10.

(e) Company is hereby granted the right to reprint the lyrics of Controlled Compositions on the jackets, sleeves, booklets, inserts, liner notes or other packaging of Records derived from master recordings hereunder. Company shall provide appropriate copyright notices and writer and publisher credits with respect to such reprinted lyrics in the same manner as such notices and credits have been provided to Company.



**12.03.**  You acknowledge, recognize and agree that Artist's services hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as a breach of such services will cause Company irreparable damages, Company shall be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach.

Case 3:07-cv-00559-JJB-SCR    Document 31-2 *SEALED*    06/03/2008    Page 9 of 13

**12.04.** The rights and remedies of the parties as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of the parties; either party may decline to exercise one or more of its rights and remedies as it may deem appropriate without jeopardizing any other of its rights or remedies; and all of each party's rights and remedies shall survive the expiration of the term of this agreement. Notwithstanding anything in this agreement, Company may at any time exercise any right which it now has or at any time hereafter may be entitled to as a member of the public as though this agreement were not in existence.

## · 13. DEFINITIONS:

**13.01.** ``Record" or ``Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use or use in means of transportation, including records of sound alone and audiovisual Recordings.

**13.02.** ``Master," ``Master Recording" or ``Recording" means any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

**13.03.** ``Performance" means singing, speaking, conducting or playing an instrument, alone or with others.

**13.04.** The words ``single Record" or ``Single" means a Record containing not more than three (3) Sides.

**13.05.** ``Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than three (3) Sides.

**13.06.** ``Mini LP" or ``EP" means a Record containing not less than four (4) or more than seven (7) Sides and not less than twenty (20) minutes of playing time.

**13.07.** The term ``Multiple Record LP" means an LP containing two or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record LP accepted by Company shall be deemed only one (1) LP.

**13.08.** ``Person" means any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

**13.09.** ``Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

**13.10.** (a) ``Suggested Retail List Price" means (i) with respect to Records sold for distribution in the United States, Company's suggested retail list price in the United States during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price shall be made for each price configuration of Phonograph Records manufactured and sold by Company; and (ii) with respect to Records sold hereunder for distribution outside the United States, Company's or its licensees' suggested or applicable retail price in the country of manufacture or sale, as Company is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by Company or its licensee(s) in conformity with the general practice of the recording industry in such country, provided that Company shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for the collection of Mechanical Royalties.

(b) Company may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the ``New Basis''), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Royalty Base Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars-and-cents royalty amounts payable with respect to the top-line product through normal retail channels would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate shall be reduced in the ratio of the royalty rate for such sales to the royalty rates for sales of top-line product. If there are other adjustments made by Company that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of small quantities of free goods than theretofore distributed), then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c) Notwithstanding anything to the contrary contained herein, the Suggested Retail List Price for premium Records shall be Company's actual sales price of such Records.

(d) Notwithstanding anything to the contrary herein, the Suggested Retail List Price with respect to so-called home video devices manufactured and distributed by *Company* shall be Company's published wholesale price as of the commencement of the accounting period concerned.

**13.11.** ``Container Charge'' shall mean ten percent (10%) of the Suggested Retail List Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided (provided that if the sleeve of such LP is other than plain white stock paper, the Container Charge shall mean twelve and one-half percent (12 1/2%) of the Suggested Retail List Price); fifteen percent (15%) of the Suggested Retail List Price for an LP in a double-fold or gatefold jacket, or non-standard jacket or with inserts; and twenty percent (20%) of such Price for Records in non-disc form, audiovisual Records, or compact discs. The placement of a sticker on an otherwise standard jacket will not in and of itself render the jacket or sleeve non-standard for the purposes of this clause. There will be no container charge on single Records shipped in Company's plain stock sleeve.

**13.12.** ``Royalty Base Price'' means the Suggested Retail List Price less all excise, sales and similar taxes included therein and less the applicable Container Charge.

**13.13.** ``LP'' or ``Album'' means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-inch, 33 1/3, long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time.

**13.14.** The words ``term of this agreement'' or ``period of this agreement'' or ``term hereof'' or ``so long as this agreement remains in force'' or words of similar connotation shall include the initial period of this agreement and the period of all renewals, extensions and substitutions or replacements of this agreement.

**13.15.** ``United States'' mean the United States of America, its territories, possessions and military exchanges.

**13.16.** ``Contract Period'' means the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

**13.17.** ``Composition'' means a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

**13.18.** ``Controlled Composition'' means a Composition wholly or partly written, owned or controlled by you, the Artist, an individual producer or or any Person in which you, the Artist or an individual producer has a direct or indirect interest.

13.19. (a) ``Budget Record'' means a Record bearing a Suggested Retail List Price that is no more than sixty-seven (67%) of the Suggested Retail List Price in the country concerned of top-line single disc LPs.

(b) ``Mid-line Record'' means a Record bearing a Suggested Retail List Price that is between eighty percent (80%) and sixty-seven percent (67%) of the Suggested Retail List Price in the country concerned of top-line single disc LPs.

13.20. ``Net Sales'' means sales of Records paid for or credited and not returned, less returns and credits, after deduction of reasonable reserves against anticipated returns and credits.

13.21. ``Advance'' means a prepayment of royalties and shall be chargeable against and recoupable from any royalties other than mechanical royalties otherwise payable hereunder, but not otherwise returnable.

13.22. ``Territory'' shall mean the Universe.

13.23. ``Sales Through Normal Retail Channels'' means sales other than as described in clauses 7.02, 7.03, 7.04, 7.06, and 7.07.

13.24. ``Mechanical Royalties'' means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

13.25. ``Joint Recordings'' means Masters embodying the Artist's performance and any performance by another artist with respect to whom Company is obligated to pay royalties.

## 14. MISCELLANEOUS:

14.01. Company may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of Company, or to any partnership or other venture in which Company participates, and such rights may be assigned by any assignee. No such assignment shall relieve Company of any of its obligations. Company may also assign its rights to any of its licensees if advisable in Company's sole discretion to implement the license granted.

14.02. This agreement has been entered into in the *State of Louisiana* and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the *State of Louisiana* applicable to contracts entered into and performed entirely within such state. The *Louisiana* courts (state and federal) only will have jurisdiction of any controversies regarding this agreement and the parties hereto consent to the jurisdiction of said courts.

14.03. In entering into this agreement and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you as Company's agent or employee.

14.04. The headings of the clauses herein are intended for convenience only, and shall not be of any effect in construing the contents of this agreement.

14.05. This agreement shall not become effective until executed by all parties hereto.

14.06. Any and all riders, exhibits or schedules annexed hereto together with this basic document shall constitute this agreement.

**14.07.**   You recognize that the sale of Records is speculative and agree that the judgment of Company with respect to matters affecting the sale, distribution and exploitation of such Records shall be binding upon you.  Nothing contained in this agreement shall obligate Company to make, sell, license or distribute Records manufactured from the Masters recorded hereunder except as specified herein.

**14.08.**  You acknowledge you understand your right to be represented by an attorney.  You represent that you have in fact reviewed this matter with any attorney of your own choice or have intentionally and knowingly waived that right.  You further represent that you are knowledgeable concerning the issues controlled by this Agreement and have negotiated with Company concerning the terms and/or conditions that are contained in this Agreement.  That the contract represents the conclusion of a negotiation between you and the Company.

TRILL ENTERTAINMENT, INC.

BY: _____

AGREED AND ACCEPTED:

BY: _____
TORENCE HATCH P/K/A LIL BOOSIE



# TRILL ENTERTAINMENT, L.L.C.

# EXCLUSIVE RECORDING AGREEMENT WITH ARTIST

AN AGREEMENT made this 27th day of January, 2005, between *TRILL ENTERTAINMENT, L.L.C.* (hereinafter referred to as ``**Company**'') and WEBSTER GRADNEY, JR.  P/K/A WEBBIE (hereinafter referred to as ``**you**'' or "**Artist**").

## 1. REPRESENTATIONS, WARRANTIES AND COVENANTS:

**1.01.**  During the term of this agreement, you will furnish to Company your exclusive recording services in the Territory.

**1.02.**  You are authorized, empowered and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment hereof by any party infringes upon the rights of any Person. You have no knowledge of any claim or purported claim which would interfere with Company's rights hereunder or create any liability on the part of Company.

**1.03** Omitted.

**1.04.**  There now  exist no prior unreleased recorded performances.

**1.05.**  Omitted.

**1.06.**  You will not perform for (and neither you license or consent to or permit the use  by any Person other than Company your name or likeness for) or in connection with the recording or exploitation of any Phonograph Record embodying any Composition recorded by you under this agreement prior to the later of the date five (5) years subsequent to the date of delivery to Company hereunder of the last Master.

**1.07.**  None of the Masters hereunder, nor the  performances embodied thereon, nor any other Materials, as hereinafter defined, nor any authorized  use thereof by Company or its grantees, licensees or assigns, will violate or infringe upon the rights of any third party. ``Materials'' as used herein means: all Controlled Compositions; each name or sobriquet used by you or Artist, individually or as a group; and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by you or any individual producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

**1.08.** You shall not authorize or knowingly permit your performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Phonograph Records in violation of the restrictions herein, and you shall take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than Company of such Phonograph Records. You, nor any Person deriving any rights from you, shall use or authorize or permit any Person other than Company to use your name (including any professional name or sobriquet), likeness (including picture, portrait or caricature) or biography in connection with the manufacture and/or exploitation of Masters or Phonograph Records.



EXHIBIT

B

Page 1 of 13



**1.09.** You will perform under a professional name, to be chosen by you and agreed to by Company. You will be the sole owner of such professional name and no other Person has or will have the right to use such name in connection with Phonograph Records during the term. You shall not use a different name in connection with Phonograph Records unless Company agrees in writing.



## 2. <u>TERM:</u>

**2.01.** The term of this agreement will commence on the date hereof and continue, unless extended as provided herein, for a first Contract Period (sometimes referred to as the ``initial Contract Period") ending *seven (7)* months after the date of the delivery to Company of all Masters required in fulfillment of your Recording Commitment for such Period but in no event earlier than *twelve (12)* months after the date of the commencement of such period.

**2.02.** Additionally, you hereby grant Company ten (10) separate options to extend the term of this agreement for additional Contract Periods (``Option Periods") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein. Company may exercise each of those options by sending you a notice at any time before the expiration of the Contract Period which is then in effect. If Company exercises such an option, the Option Period concerned will begin immediately after the end of the current Contract Period. The term of each option period will end *seven (7)* months after the date of delivery to Company of all Masters required in fulfillment of your Recording Commitment for such Period but not earlier than *eighteen (18)* months after the date of commencement of the first and second Option Periods and *twelve (12)* months after the date of commencement of the third Option Period.







Page 3 of 13



Page 4 of 13

## 7. ROYALTIES:

**7.01.** In consideration of (i) the copyright ownership provided below; (ii) Company's rights to use Artist's name and likeness as provided herein; and (iii) the other agreements, representations and warranties contained herein, Company agrees to pay you in connection with the Net Sale of Phonograph Records consisting entirely of Masters hereunder and sold by Company or its licensees, a royalty computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such royalties will be computed and paid in accordance with clause 8 below and the other provisions set forth herein:

(A) On Records sold for distribution through normal retail channels in the United States (``USNRC Net Sales''):

    (i) On LPs:

        (a) On Masters made during the initial Contract Period: ███████

        (b) The royalty rate pursuant to clause 7.01(A)(i)(a) shall apply to the first ████████ of USNRC Net Sales of LPs comprised of such Masters. The royalty rate will be:

            (1) ███ rather than ███ on the next ████████ of any such LP (*i.e.*, USNRC Net Sales between ████████ and ████████ and

            (2) ███ on USNRC Net Sales of any such LP in excess of ████████

        (c) On Masters made during any Option Period: ██████

        (d) The royalty rate pursuant to clause 7.01(A)(i)(c) shall apply to the first ████████ of USNRC Net Sales of LPs comprised of such Masters. The royalty rate will be:

            (1) ███ rather than ███ on the next ████████ of any such LP (*i.e.*, USNRC Net Sales between ████████ and ████████

            (2) ███ on USNRC Net Sales of any such LP in excess of ████████

    (ii) On Singles: ████

(B) On Records sold for distribution through normal retail channels outside the United States, the royalty rate shall be ████████ of the applicable royalty rate provided in clauses 7.01(A)(i)(a), 7.01(A)(i)(c), 7.01(A)(i)(e), or 7.01(A)(ii), as the case may be.





**7.05.** As to Records not consisting entirely of Masters, the royalty rates otherwise payable to you hereunder shall be prorated on the basis of the number of Masters which are embodied on such records compared to the total number of masters (including the Masters) contained on each such Record. As to Joint Recordings, the royalty rate due shall be the royalty rate provided for herein divided by the number of artists with respect to whom Company is obligated to pay a royalty (including Artist).

**7.06.** No royalties shall be due or payable in respect of (i) Records furnished on a no-charge basis or sold for less than ███████████████ Company's or the *Company Distributor's* (or their respective licensees') posted wholesale list price to disc jockeys, publishers, employees of Company or the *Company Distributor* (or their respective licensees'), motion picture companies, radio and television stations and other customary recipients of free, discounted or promotional Records; (ii) Records sold by Company or the *Company Distributor* at close-out prices or for scrap, or at less than Company's or its Distributor's (or their respective licensees') inventory cost; (iii) Records (or fractions thereof) given away or shipped on a so-called ``no charge'' or ``freebie'' basis or sold for ███████████████ or less of Company's or *Company Distributor's* (or their respective licensees') posted wholesale list price, to distributors, sub-distributors, dealers and others.

**7.07.** The royalty payable to you hereunder includes all royalties due Artist, the individual producers and any other Persons on account of the sale of Records hereunder (other than AF of M or other similar per-record royalties and mechanical royalties).

## 8. ROYALTY ACCOUNTINGS:





## 9. COMPANY'S ADDITIONAL RIGHTS:

**9.01.** You warrant, represent and agree that throughout the Territory, Company is the sole, exclusive and perpetual owner of all  Masters delivered hereunder or recorded by Artist during the term of this agreement, which ownership entitles Company, among other things, to all right, title and interest in the copyright in and to the Masters (but excluding the copyrights of the musical compositions contained therein). Each Master made under this agreement or during its term, from the inception of its recording, will be considered a ``work made for hire'' for Company; if any such Master is determined not to be such a ``work,'' it will be deemed transferred to Company by this agreement, together with all rights and title in and to it. All Masters made under this agreement or during its term (including duplicates, work tapes, etc.), the performances contained  thereon and the Recordings derived therefrom shall, from the inception of their creation, be the sole property of Company, in perpetuity, free from any claims by you, Artist or any other Person and Company shall have the right to use and control same subject to the terms herein. Company (or Company's designees) shall have the exclusive right to copyright all such Masters in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the Territory. You will execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company or its designees in the Masters subject to this agreement as Company may reasonably request to carry out the purposes of this agreement, and Company may sign such documents in your name or the name of Artist (and you hereby appoint Company your agent and attorney-in-fact for such purposes) and make appropriate disposition of them  consistent with this agreement.

Page 7 of 13

**9.02.**  Without limiting the  generality of the foregoing, Company and any Person authorized by Company shall have the unlimited and exclusive rights to manufacture Records by any method(s) now or hereafter known embodying any portion(s) or all of the performances embodied on  Masters hereunder; to publicly perform such Records and to permit the public performance thereof in any medium; to import, export, sell, transfer, lease, rent, deal in or otherwise dispose of such Masters and Records derived therefrom throughout the Territory under any trademarks, trade names or labels designated by Company; to edit or adapt the Masters to conform to technological or commercial requirements in various formats now or hereafter known or developed, or to eliminate material  which might subject Company to any legal action; to use the Masters for background music, synchronization in motion pictures and television soundtracks and other similar purposes, including, without limitation, use on transportation facilities,  without any payment other than as provided herein; or Company and its subsidiaries, affiliates and licensees may, at their election, delay or refrain from doing any one or more of the foregoing.

**9.03.**  Company and any licensee of Company each shall have the perpetual right, without liability to any Person, and may grant to others the right, to reproduce, print, publish or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and individual producer and all other persons performing services in connection with Masters made under this agreement (including, without limitation, all professional, group and other assumed or fictitious names used by them), and biographical material concerning them  for purposes of advertising, promotion and trade in connection with you or Artist, the making and exploitation of Records hereunder and general goodwill advertising. During the term hereof, Company or its licensees may, in the Territory, bill, advertise and describe Artist as an Exclusive Company Artist or by a similar designation. Company's rights as described in this clause shall be exclusive during the term of this agreement and non-exclusive thereafter. Artist shall be  available from time to time to appear for photography, poster and cover art and the like, under the reasonable direction of Company or its nominees, and to appear for interviews with  representatives of the communications media and Company's  publicity personnel.  You shall not be entitled to any compensation for such services, except as may be required by applicable union agreements; provided, however, that if you are required to travel outside of a fifty mile radius of your then place of residence, Company shall reimburse you for the reasonable travel and living expenses incurred by you or Artist in connection with the rendition of services rendered at Company's  direction as provided herein pursuant to a budget approved in advance by Company in writing.

## 10. LICENSES FOR MUSICAL COMPOSITIONS:

**10.01.**  (a) (1) You hereby grant to Company an irrevocable license under copyright to reproduce each Controlled Composition on Phonograph Records and distribute them in the United States and Canada.

(2) For that license, Company will pay Mechanical Royalties, on the basis of Net Sales, at the following rates:

(i) *On Records manufactured for distribution in the United States:* The rate equal to ████████ ████ of the  minimum compulsory license rate applicable to the use of musical compositions on Phonograph Records under the United States copyright law at the time of the commencement of the recording of the Master concerned but in no event later than the last date  for timely delivery of such Master. (That minimum statutory rate is currently 7.1 cents per Composition, effective January 1, 1998.)

(b) The total Mechanical Royalty for all Compositions (including Controlled Compositions) with respect to (i) each single disc LP (or the equivalent thereof) shall be ████████████████████ the minimum statutory rate referred to in subclause 10.01(a)(2)(i);

(c)  Company will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On the next May 15th, August 15th, November 15th, or February 15th, Company will send a statement covering those royalties and will pay any net royalties which are due. Mechanical Royalty reserves maintained by Company against anticipated returns and credits will not be held  for an unreasonable period of time.

Case 3:07-cv-00559-JJB-SCR     Document 31-3 *SEALED*     06/03/2008    Page 8 of 13

(d) Any assignment made of the ownership of copyright in, or the rights to license or administer the use of, any Controlled Composition shall be made subject to the provisions of this Clause 10.

(e) Company is hereby granted the right to reprint the lyrics of Controlled Compositions on the jackets, sleeves, booklets, inserts, liner notes or other packaging of Records derived from master recordings hereunder. Company shall provide appropriate copyright notices and writer and publisher credits with respect to such reprinted lyrics in the same manner as such notices and credits have been provided to Company.



## 12. COMPANY'S ADDITIONAL REMEDIES:



**12.03.** You acknowledge, recognize and agree that Artist's services hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as a breach of such services will cause Company irreparable damages, Company shall be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach.

Case 3:07-cv-00559-JJB-SCR    Document 31-3 *SEALED*    06/03/2008    Page 9 of 13

**12.04.** The rights and remedies of the parties as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of the parties; either party may decline to exercise one or more of its rights and remedies as it may deem appropriate without jeopardizing any other of its rights or remedies; and all of each party's rights and remedies shall survive the expiration of the term of this agreement. Notwithstanding anything in this agreement, Company may at any time exercise any right which it now has or at any time hereafter may be entitled to as a member of the public as though this agreement were not in existence.

## 13. DEFINITIONS:

**13.01.** ``Record" or ``Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use,  juke box use or use in means of transportation, including records of sound alone and audiovisual Recordings.

**13.02.** ``Master," ``Master Recording" or ``Recording" means any recording of sound, whether or not coupled with a visual image, by any  method and on any substance or material, whether now or hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

**13.03.** ``Performance" means singing, speaking, conducting or playing an instrument, alone or with others.

**13.04.** The words ``single Record" or ``Single" means a Record containing not more than three (3) Sides.

**13.05.** ``Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than  three (3) Sides.

**13.06.** ``Mini LP" or ``EP" means a Record containing not less than four (4) or more than seven (7) Sides and not less than twenty (20) minutes of playing time.

**13.07.** The term ``Multiple Record LP" means an LP containing two  or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent. For purposes of the Recording Commitment hereunder  and for computing the applicable Recording Fund or Advance, a Multiple Record LP accepted by Company shall be deemed only  one (1) LP.

**13.08.** ``Person" means any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

**13.09.** ``Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

**13.10.** (a) ``Suggested Retail List Price" means (i) with respect to Records sold for distribution in the United  States, Company's suggested retail list price in the United States during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price shall  be made for each price configuration of Phonograph Records manufactured and sold by Company; and (ii) with respect to Records sold hereunder for distribution outside the United States, Company's or its licensees' suggested or applicable retail  price in the country of manufacture or sale, as Company is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by Company or its licensee(s) in conformity with the general practice of the recording industry in such country, provided that Company shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for the collection of Mechanical Royalties.

(b) Company may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the ``New Basis''), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Royalty Base Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars-and-cents royalty amounts payable with respect to the top-line product through normal retail channels would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate shall be reduced in the ratio of the royalty rate for such sales to the royalty rates for sales of top-line product. If there are other adjustments made by Company that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of small quantities of free goods than theretofore distributed), then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c) Notwithstanding anything to the contrary contained herein, the Suggested Retail List Price for premium Records shall be Company's actual sales price of such Records.

(d) Notwithstanding anything to the contrary herein, the Suggested Retail List Price with respect to so-called home video devices manufactured and distributed by *Company* shall be Company's published wholesale price as of the commencement of the accounting period concerned.

**13.11.** ``Container Charge'' shall mean ten percent (10%) of the Suggested Retail List Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided (provided that if the sleeve of such LP is other than plain white stock paper, the Container Charge shall mean twelve and one-half percent (12 1/2%) of the Suggested Retail List Price); fifteen percent (15%) of the Suggested Retail List Price for an LP in a double-fold or gatefold jacket, or non-standard jacket or with inserts; and twenty percent (20%) of such Price for Records in non-disc form, audiovisual Records, or compact discs. The placement of a sticker on an otherwise standard jacket will not in and of itself render the jacket or sleeve non-standard for the purposes of this clause. There will be no container charge on single Records shipped in Company's plain stock sleeve.

**13.12.** ``Royalty Base Price'' means the Suggested Retail List Price less all excise, sales and similar taxes included therein and less the applicable Container Charge.

**13.13.** ``LP'' or ``Album'' means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-inch, 33 1/3, long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time.

**13.14.** The words ``term of this agreement'' or ``period of this agreement'' or ``term hereof'' or ``so long as this agreement remains in force'' or words of similar connotation shall include the initial period of this agreement and the period of all renewals, extensions and substitutions or replacements of this agreement.

**13.15.** ``United States'' mean the United States of America, its territories, possessions and military exchanges.

**13.16.** ``Contract Period'' means the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

**13.17.** ``Composition'' means a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

**13.18.** ``Controlled Composition'' means a Composition wholly or partly written, owned or controlled by you, the Artist, an individual producer or or any Person in which you, the Artist or an individual producer has a direct or indirect interest.

13.19.  (a) ``Budget Record'' means a Record bearing a Suggested Retail List Price that is no more than sixty-seven (67%) of the Suggested Retail List Price in the country concerned of top-line single disc LPs.

(b) ``Mid-line Record'' means a Record bearing a Suggested Retail List Price that is between eighty percent   (80%) and sixty-seven percent (67%) of the Suggested Retail List Price in the country concerned of top-line single disc LPs.

13.20.  ``Net Sales'' means sales of Records paid for or credited and not returned, less returns and credits, after deduction  of reasonable reserves against anticipated returns and credits.

13.21.  ``Advance'' means a prepayment of royalties and shall be chargeable against and recoupable from any royalties other than mechanical royalties otherwise payable hereunder, but not otherwise returnable.

13.22.  ``Territory'' shall mean the Universe.

13.23.  ``Sales Through Normal Retail Channels'' means sales other than as described in clauses 7.02, 7.03, 7.04, 7.06, and 7.07.

13.24.  ``Mechanical Royalties'' means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

13.25.  ``Joint Recordings'' means Masters embodying the Artist's performance and any performance by another artist with  respect to whom Company is obligated to pay royalties.


## 14. MISCELLANEOUS:

14.01. Company may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person  owning or acquiring a substantial portion of the stock or assets of Company, or to any partnership or other venture in which Company participates, and such rights may be assigned by any assignee. No such assignment shall relieve Company of any of its obligations. Company may also assign its rights to any of its licensees if advisable in Company's sole discretion to implement the license granted.

14.02. This agreement has been entered into in the *State of Louisiana* and  the validity, interpretation and legal effect of this agreement shall be governed by the laws of the *State of Louisiana* applicable to contracts entered into and performed entirely within such state. The *Louisiana* courts (state and federal) only will have jurisdiction of any controversies regarding this agreement and the parties hereto consent to the jurisdiction of said courts.

14.03.  In entering into this agreement and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you as Company's agent or employee.

14.04.  The headings of the clauses herein are intended for convenience only, and shall not be of any effect in construing the contents of this agreement.

14.05.  This agreement shall not become  effective until executed by all parties hereto.

14.06.  Any and all riders, exhibits or schedules annexed hereto together with this basic document shall constitute this agreement.

14.07.   You recognize that the sale of Records is speculative and agree that the judgment of Company with respect to matters affecting the sale, distribution and exploitation of such Records shall be binding upon you.  Nothing contained in this agreement shall obligate Company to make, sell, license or distribute Records manufactured from the Masters recorded hereunder except as specified herein.

14.08.   You acknowledge you understand your right to be represented by an attorney.  You represent that you have in fact reviewed this matter with any attorney of your own choice or have intentionally and knowingly waived that right.   You further represent that you are knowledgeable concerning the issues controlled by this Agreement and have negotiated with Company concerning the terms and/or conditions that are contained in this Agreement.  That the contract represents the conclusion of a negotiation between you and the Company.

TRILL ENTERTAINMENT, INC.

BY: _Melvin Vernell Jr._

AGREED AND ACCEPTED:

BY: _Webster Gradney_
    WEBSTER GRADNEY, JR.
    P/K/A WEBBIE